IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUZETTE WHITMAN | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 08-2667 |
| PROCONEX, INC. | : | |

**SURRICK, J.**                                                         **JANUARY 20, 2009**

**<u>MEMORANDUM & ORDER</u>**

Presently before the Court is Defendant's Motion for Summary Judgment.  (Doc. No. 9.)

For the following reasons, Defendant's Motion will be granted in part and denied in part.

**I.      BACKGROUND**

On June 6, 2008, Suzette Whitman ("Plaintiff") filed this action claiming that her

employer Proconex, Inc. ("Defendant"), violated her rights under the Family and Medical Leave

Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq*.  The following facts were developed during

the course of discovery.[1]

Plaintiff has three minor daughters.  (Whitman Dep. at 10, 16.)  The youngest daughter,

Jessica, was diagnosed at birth with Down Syndrome.  (*Id*. at 16.)  She has pulmonary disease, as

a result of having respiratory syncytial virus and pneumonia as an infant, and has had several

bouts of pneumonia.  (*Id*. at 48, 179-80.)  When Plaintiff receives calls from Jessica's school

_____

[1] Transcripts of the deposition testimony of the parties and witnesses are attached to
Defendant's Summary Judgment Motion (Doc. No. 9) and will be cited as: ([NAME] Dep. at
##).  Emails and other documentary evidence were also attached as exhibits to Defendant's
Motion and were marked "Exhibit Whitman-#."  We will identify particular exhibits from this
series as follows: (Doc. No. 9, Ex. W- #).

nurse, the calls are primarily related to breathing problems.  (*Id*. at 207.)  Jessica also has

behavioral issues and problems with aggression.  (*Id*. at 48.)  She is very hyper and compulsive,

and needs to be watched constantly.  (*Id*. at 205.)  She receives "wraparound care," which

includes an aide who comes to the home as well as a full-time aide at school.  (*Id*. at 48-50.)

Plaintiff takes her daughter to a psychologist, a psychiatrist, and a pediatric neurologist.  (*Id*. at

48-50, 206.)

From approximately 1989 to 1996, Plaintiff worked for C.B. Ives and then for Proconex,

Inc. (hereinafter, "Defendant"), following its acquisition of C.B. Ives.  (*Id*. at 12.)  In 1996,

Plaintiff left Defendant and worked for another company named Kinetics.  (*Id*.)  Plaintiff

returned to Defendant's employ on August 15, 2005, and worked as a sales associate.  (*Id*. at 27;

Doc. No. 9, Ex. W-2.)  Upon her return, Plaintiff received some training and she received an

employee handbook.  (Whitman Dep. at 30; Doc. No. 9, Ex. W-3.)  The handbook included

Defendant's FMLA policy.  (Whitman Dep. at 46.)  As a sales associate on the General Territory

Team ("GTT"), Plaintiff worked with four applications engineers ("AEs") as well as several

outside sales associates.  (*Id*. at 30-31.)  Plaintiff reported to Phil Russo, Defendant's manager of

inside sales.  (*Id*. at 33.)  Plaintiff's responsibilities included supporting the AEs and outside

sales associates by answering telephones, expediting and pulling and typing orders, pricing parts,

calling customers, and filing.  (*Id*. at 35.)

In April 2006, Plaintiff met with Russo and Lynnda Petrucelli, Defendant's human

resources manager, regarding attendance issues.[2]  (*Id*. at 35; Doc. No. 9, Ex. W-5; *see also* Doc.

---

[2] It is not disputed that "[t]he 2006 absences addressed by Russo in April 2006 were not
FMLA covered as [Plaintiff] who was rehired in August of 2005 had not returned to [Defendant]
for one year. . . .  The FMLA requires for purposes of eligibility that the employee work 1250

No. 9, Ex. W-4 (2006 Attendance Record).)  The meeting was called because Plaintiff had been absent to care for her middle daughter, who had been diagnosed with mononucleosis and had missed approximately four weeks of school.  (Whitman Dep. at 35.)  Plaintiff's husband, from whom she is separated, would not watch his daughter.  (*Id*. at 38-39.)  Plaintiff took both sick days and paid vacation days to care for her daughter.  (*Id*. at 42-43; *see also* Doc. No. 9, Ex. W-4.)  During the meeting, Russo and Petrucelli asked Plaintiff whether anyone else could watch her daughters when they became sick.  (Whitman Dep. at 39-40.)  Plaintiff informed them that there was no one who could assist her in watching her children when they were ill.  (*Id*. at 41.)  Russo and Petrucelli told Plaintiff to provide a doctor's certification of illness for days missed under Defendant's sick leave policy.  (*Id*. at 41; Doc. No. 9, Ex. W-5.)  They also warned that a "continuation of excessive absenteeism can lead to termination."  (Doc. No. 9, Ex. W-5.)

As of January 1, 2007, Russo was fully aware of Jessica's condition.  (Whitman Dep. at 205, 207-08; Russo Dep. at 11, 32.)  Plaintiff had informed Russo about Jessica's behavior, as well as about her hospital stays.  (Whitman Dep. at 204.)  Jessica had also visited the office, and Russo had met her.  (*Id*.)  Plaintiff was familiar with the FMLA because she had taken FMLA leave in 2001, while working at Kinetics, when Jessica needed a tracheotomy and open-heart surgery.  (*Id*. at 16.)  However, Plaintiff did not realize, and was not told by Defendant, that an employee could use FMLA day by day.  (*Id*. at 46, 55.)

In April 2007, Plaintiff had another meeting with Russo about attendance issues.  (*Id*. at 61; *see also* Doc. No. 9, Ex. W-6 (2007 Absentee Record).)  The meeting was preceded by an

--------

hours and be employed for one year."  (Doc. No. 9 at 3 n.2 (*citing* 29 C.F.R. § 825.1109(a)(1), (2)); *see also* Doc. No. 11 at 23.)

email exchange between Plaintiff and Russo.  (Whitman Dep. at 58; Doc. No. 9, Ex. W-7.)  On

April 23, 2007, Russo sent Plaintiff an email stating:

> You have been missing quite a few days lately.  Is everything alright? I realize that
> some of the absences are a bit out of your control, but the strain it is placing on the
> GTT is causing stress for all involved.  I don't even want to ask because I think I
> know the answer, but how is your desk load right now? I [sic] has to be out of
> control.  We . . . need to have a discussion when you are in next.

(Doc. No. 9, Ex. W-7.)  That April, Plaintiff had taken four sick days and two and one-half

vacation days as a result of her middle daughter's double ear infection and wheezing, Jessica's

bronchitis, and Plaintiff's "stomach bug."  (Whitman Dep. at 58; Doc. No. 9, Ex. W-6; *id*. Ex.

W-7.)  Work backed-up at Plaintiff's desk as a result of these absences.  (Whitman Dep. at 59.)

Plaintiff attended a meeting with Russo and Jim Baker, Lead AE, on April 25, 2007.  (Doc. No.

9, Ex. W-8.)  Russo summarized the meeting in an email memorandum sent on April 26, 2007.

(*Id*.)  Russo stated that the meeting

> was called because [Plaintiff] has missed a high percentage of days over the last two
> weeks (approximately 5.5 days out of the last 10 working days) because of various
> family or personal illnesses.  This missed time is causing much strain on the work
> flow of the GTT, and customers are being effected [sic] in a negative way.

(*Id*.)  Among the topics discussed at the meeting was the possibility of Plaintiff making up

missed work so that she could work full forty-hour work-weeks.  (*Id*.)  Also discussed was the

requirement that Plaintiff submit doctor's notes from her recent absences or those absences

would be charged as vacation days or absences without pay.  (*Id*.)  Plaintiff was very limited in

her ability to make-up lost work-time, however, because of her childcare obligations.  (Whitman

Dep. at 62-64.)  Defendant never charged Plaintiff's absences to her vacation account.  (*Id*. at

68.)  Rather, Plaintiff often opted to use vacation days.  (*Id*.)  She generally used vacation time

for doctor's visits and appointments for Jessica with the psychologist or psychiatrist and

4

neurologist.  (*Id*. at 68-69.)  Plaintiff designated many of her absences as vacation days, even though they were taken to care for her children when they were ill, because it would reduce the overall amount of time that she was out of the office.  (*Id*. at 203.)  None of Plaintiff's supervisors ever disputed how Plaintiff designated her absences.  (*Id*. at 209.)

During 2007, there were complaints about Plaintiff's work performance.[3]  (Whitman Dep. at 78-80, 94.)  Alan Ehrlich, an AE on Plaintiff's team, forwarded or generated many of the complaints.  (*See* Doc. No. 9, Ex. W-9; *id*., Ex. W-14; *id*., Ex. W-15; *id*., Ex. W-16; *id*., Ex. W-17; *id*., Ex. W-19; *id*., Ex. W-20.)  Ehrlich had been asked by Petrucelli to keep track of all complaints and issues regarding Plaintiff.  (*See id*. Ex. W-14.)  Ehrlich was himself the subject of work-performance complaints.  (Whitman Dep. at 99, 128; *see also* Doc. No. 9, Ex. W-26.)  In addition, on July 25, 2007, Mark Thurwanger, an AE manager, recommended to Russo that Defendant "cut bait and get rid of her."  (Doc. No. 9, Ex. W-12.)  He noted time-wasting concerns:  "She's talking about time yet I saw here [sic] talking with the usual suspects many times today."  (*Id*.)  In an email to Russo with the subject line "Efficiency," Baker documented thirty-six minutes of personal phone use by Plaintiff in one morning.  (*Id*., Ex. W-19.)  On October 31, 2007, Thurwanger corresponded with Russo regarding complaints about the GTT:

> [T]he biggest problem is the fact that [Plaintiff] is only working about 30 hours a week (if that) for a job that requires 40.  Although I feel for her personal situation, we have to take a firm stance here and advise her that 40 hours a week is required and expected.

(Doc. No. 9, Ex. W-26.)  The complaints regarding Plaintiff's performance mainly highlighted

---

[3] There are emails documenting at least sixteen customer complaints and concerns, which ostensibly relate to Plaintiff, between May 21, 2007, and November 6, 2007.  Not all of these complaints mention Plaintiff by name.  (*See, e.g.*, Doc. No. 9, Ex. W-18.)

her poor response time or failure to respond to customer inquiries.  (*See* Doc. No. 9, Ex. W-21; *id*., Ex. W-22; *id*., Ex. W-25.)

In July 2007, Plaintiff was chastised for wearing inappropriate clothes to work. (Whitman Dep. at 80; Doc. No. 9, Ex. W-10.)  At a meeting on July 24, 2007, Petrucelli told Plaintiff that her blouses were too low-cut.  (Whitman Dep. at 80.)  Plaintiff was also advised to watch her use of profanity in the workplace.  (*Id*. at 81.)  On August 3, 2007, Thuranger advised Plaintiff that she was in violation of the dress code and gave her the opportunity to go home and change and return to work, or to take a vacation day.  (*Id*. at 84; Doc. No. 9, Ex. W-13.)  Plaintiff opted to take a vacation day and left work at 9:15 a.m.  (Doc. No. 9, Ex. W-13.)  She felt that she was being singled-out.  (Whitman Dep. at 89.)  Plaintiff subsequently had a discussion with Bob Batten, Defendant's sales manager of valves, about the dress code.  (*Id*. at 90-91.)

Plaintiff took personal days on November 1 and 2, 2007, when Social Services became involved with her family over a concern regarding Plaintiff's youngest daughter.  (*Id*. at 145-47; *see also* Doc. No. 9, Ex. W-6.)  Plaintiff took a sick day on October 30, 2007, as well as half of a vacation day on November 5, 2007.  (Doc. No. 9, Ex. W-6.)  On November 6, 2007, Ernie James, a customer, complained that Plaintiff was not responding to a request that he had made. (*See* Doc. No. 9, Ex. W-25.)  Plaintiff had sent James incorrect information on October 25, 2007. (*Id*.)  James requested an update on October 31, 2007.  (*Id*.)  James emailed Plaintiff's teammates on November 6, 2007, when he still had not heard from Plaintiff:  "[T]his is like pulling teeth.  I am STILL waiting for the PMI cert for FV-14735.  The one [Plaintiff] sent me on October 25th was wrong.  I asked her last Wednesday politely how this is going . . . no response.  WTF?"  (*Id*.)  Bill Cook, a GTT teammate, informed James that Plaintiff had been

absent for several days. (*Id*.) The email chain was then forwarded to Russo and Batten. (*Id*.)

On Tuesday, November 27, 2007, Plaintiff received a call during lunchtime from Jessica's school that Jessica was sick and Plaintiff needed to pick her up. (Whitman Dep. at 162-63.) Jessica was having breathing problems, so Plaintiff took her to DuPont Hospital in Wilmington, Delaware, where she was admitted as a patient after doctors diagnosed her with bacterial pneumonia. (*Id*. at 163.) Plaintiff left a message for Russo telling him that she had to leave work and pick up Jessica because Jessica was not breathing right. (*Id*. at 163-64.) After 5:00 p.m. that day, Plaintiff called Baker on his cell phone and told him that she had taken Jessica to the hospital, that Jessica did not look good, and that she would keep him apprised of the situation. (*Id*. at 165.) On Wednesday, November 28, Plaintiff spoke with Russo and told him that she could not go into work that day because Jessica was in the hospital. (*Id*. at 166-68.) Plaintiff was also sick with bronchitis on this day, although she did not visit a doctor. (*Id*. 166-67.) On Thursday, November 29, Plaintiff left a message for Russo telling him that Jessica was still in the hospital, but would probably be discharged at some point in the afternoon. (*Id*. 169-70.) Plaintiff also spoke with Baker and told him the same thing, and that Jessica was off the oxygen and doctors needed to decide what antibiotics she would continue taking at home. (*Id*.) FMLA leave was never discussed. (*Id*. at 170.) Jessica was discharged from the hospital at about 1:30 p.m. or 2:00 p.m. on Thursday, November 29. (*Id*. at 171.) Plaintiff left a message for either Russo or Baker telling him that she would not be able to return to work until Monday, December 3, because Jessica was not permitted to go back to school on Friday. (*Id*.)

Meanwhile, on Wednesday, November 28, Batten held a meeting with outside sales engineers. (Batten Dep. at 13-17.) Russo was present as well. (*Id*. at 17.) Two of the

salespeople at the meeting, Colin Bozzarello and Lee Murter, complained that Plaintiff's performance was affecting their customer base.  (*Id.* at 14-15.)  The next day, Thursday, November 29, John Otte, the vice president of sales, and Petrucelli held an unscheduled meeting with Batten in his office.  (Batten Dep. at 17-18.)  Otte claims to have decided to terminate Plaintiff's employment before this meeting.  (Otte Dep. at 10.)  Specifically, Otte claims to have made the decision in early November 2007, and to have consulted John Weekley, Defendant's chief executive officer.  (*Id.* at 10-12.)  At the meeting, Otte, Petrucelli, and Batten discussed complaints about Plaintiff's performance, as well as customer frustration.  (Batten Dep. at 28.)  Otte decided to terminate Plaintiff's employment.  (*Id.* at 10.)  Petrucelli and Batten were in agreement.  (*Id.*)

Phil Russo was not involved in the decision to terminate Plaintiff.  (Russo Dep. at 16.)  On the day that the decision to terminate Plaintiff was finalized, Batten informed Russo of the termination decision and directed that he and Petrucelli make arrangements to terminate Plaintiff's employment.  (Batten Dep. at 10; Russo Dep. at 17.)  Petrucelli told Russo that they would tell Plaintiff that she was being let go on the next working day that she was in the office.  (Russo Dep. at 21.)

On Monday, December 3, 2007, Plaintiff reported to work.  (Whitman Dep. at 172.)  Within ten minutes of her arrival, she was told to attend a meeting in Petrucelli's office.  (*Id.*)  Petrucelli and Russo were present.  (*Id.* at 173.)  Petrucelli informed Plaintiff that she was being terminated for "lack of performance."  (*Id.*)  Plaintiff was shocked and did not say anything.  (*Id.*)  Russo did not speak during the meeting.  (*Id.* at 174.)  Plaintiff was permitted to pick up her jacket and purse and was then escorted out of the building.  (*Id.* at 175.)  Her personal

8

belongings were returned to her two weeks later.  (*Id*.)  Defendant held a meeting after Plaintiff's termination to announce its decision to terminate her employment.  (*Id*. at 180-81.)  Russo told the employees that Plaintiff was terminated for "poor performance."  (*Id*. at 181.)

Plaintiff claims that "Defendant terminated [Plaintiff] because she took an FMLA-covered leave to care for the serious medical condition of her daughter" (Doc. No. 1 ¶ 40); that "Defendant violated FMLA by failing to put [Plaintiff] on notice of her FMLA rights despite [D]efendant's awareness that she was entitled to same" (*id*. ¶ 41), and that "[a]lternatively and/or additionally, [D]efendant's termination of [Plaintiff] in December 2007 was made in retaliation for taking the aforementioned leave from work, in violation of FMLA" (*id*. ¶ 42).

Discovery closed on October 10, 2008.  (*See* Doc. No. 8.)  Defendant filed a Motion for Summary Judgment on November 21, 2008.  (*See* Doc. No. 9.)  Plaintiff filed her response on December 5, 2008.  (*See* Doc. No. 11.)  On December 10, 2008, Plaintiff filed a Motion for Leave to File Amended Complaint.  (*See* Doc. No. 12.)  Defendant objected to Plaintiff's request as untimely.  (*See* Doc. No. 13.)  Plaintiff's Motion was denied.  (*See* Doc. No. 14.)  On December 16, 2008, Defendant, by letter, submitted an informal motion to compel discovery. (*See* Letter from Larry J. Rappoport, Esq., Defense Counsel, to the Court (Dec. 16, 2008).) Plaintiff objected to Defendant's request as untimely.  (Letter of John A. Gallagher, Esq., Plaintiff's Counsel, to the Court (Dec. 17, 2008).)  Defendant's discovery requests were denied. (*See* Doc. No. 14.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); s*ee also*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Fed. Home Loan Mortgage Corp. v.*

*Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003). Only facts that might affect the outcome

of a case are "material." *Anderson*, 477 U.S. at 248. The moving party bears the burden of

identifying the absence of a genuine issue of material fact, which it may satisfy by "showing" the

court that there is an absence of evidence supporting the non-moving party's case. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391

F.3d 497, 502 (3d Cir. 2004). All reasonable inferences from the record are drawn in favor of

the non-movant. *Knabe v. Boury Corp.*, 114 F.3d 407, 410 n.4 (3d Cir. 1997).

Although the movant has the initial burden of demonstrating the absence of genuine

issues of material fact, the non-movant must then establish the existence of each element on

which it bears the burden of proof. *See Watson v. Eastman Kodak Co.*, 235 F.3d 851, 857-58 (3d

Cir. 2000). Plaintiffs cannot avert summary judgment with speculation or by resting on the

allegations in the pleadings, but rather must present competent evidence from which a jury could

reasonably find in their favor. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d

Cir. 1999); *Woods v. Bentsen*, 889 F. Supp. 179, 184 (E.D. Pa. 1995).

## III.   ANALYSIS

The FMLA provides that "an eligible employee shall be entitled to a total of 12

workweeks of leave during any 12-month period" for one or more qualifying reasons. 29 U.S.C.

§ 2612(a)(1). Circumstances that entitle an employee to FMLA leave include caring "for the

spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent

has a serious health condition," *id*. § 2612(a)(1)(C), or "[b]ecause of a serious health condition

that makes the employee unable to perform the functions of the position of such employee," *id.* § 2612(a)(1)(D).  "Following a qualified absence, the employee is entitled to be reinstated to the former position or an alternative one with equivalent pay, benefits and working conditions." *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005) (*citing* 29 U.S.C. § 2614(a)(1)).  In addition, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided" under the FMLA, nor may the employer "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C. § 2615(a)(1), (2).  The Court of Appeals for the Third Circuit has interpreted the FMLA as containing "two relatively distinct types of provisions": (1) "interference" provisions, which set floors for employer conduct; and (2) "retaliation" provisions, which prohibit employers from discriminating against employees for exercising their FMLA rights.  *Callison*, 430 F.3d at 119.  Plaintiff purports to assert claims for both interference and retaliation.

> A.  **FMLA Interference Claim**

Defendant argues that Plaintiff's claim "really implicates the retaliation provisions of the FMLA, not the interference provisions which will come into play when a leave request is not granted . . . ."  (Doc. No. 9 at 13.)  Defendant states that because "the undisputed evidence shows that [Plaintiff] was not denied the opportunity to leave to care for her daughter, it is not an interference claim that she is asserting, but rather a retaliation claim based on the termination which followed that absence . . ."  (*Id.*)  Plaintiff's responds by stating that "Plaintiff was terminated upon her return from FMLA leave.  Hence, she was not reinstated to her former position as required by FMLA.  This is a classic 'interference' case.  Under *Callison*, this case

must proceed to the jury." (Doc. No. 11 at 30.)

Courts have recognized that "[c]onfusion often arises as to whether an employee's FMLA claim 'is really about interference with his substantive rights, not discrimination or retaliation.'" *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006) (*quoting Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)); *see also Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007) (finding that, because of the different burdens associated with interference and retaliation claims, "it is not unusual for a plaintiff to pursue an interference theory while the defendant argues that the evidence may only be analyzed under a retaliation theory"). Here, Defendant appears to argue that because Plaintiff's claims arise out of a "termination which followed [an] absence," she cannot argue that Defendant failed to reinstate her to her position and is limited to a retaliation claim. However, even where an employee is fired after returning from leave, the employee may bring an interference claim based upon a failure to reinstate if the "employer cites only factors predating the employee's return to work to justify the adverse action." *Campbell*, 478 F.3d at 1288; *see also Stephens v. Neighborhood Serv. Org.*, No. 07-11908, 2008 U.S. Dist. LEXIS 63279, at *11 (D. Mich. Aug. 19, 2008) (finding that restoration was illusory where employer reinstated employee to her position for some hours upon her return to work but terminated her employment at the end of the day). "To hold otherwise would create a perverse incentive for employers to make the decision to terminate during an employee's FMLA leave, but allow the employee to return for a brief period before terminating her so as to insulate the employer from an interference claim." *Campbell*, 478 F.3d at 1288. Here, Plaintiff's employment was terminated within ten minutes of her arrival back at work on December 3, 2007. Defendant does not claim

12

that in deciding to terminate Plaintiff it considered any factors that arose following her return to work.  Rather, Defendant argues in defense of the termination decision both that the decision was made prior to Plaintiff taking the FMLA-qualified leave and that it was based on performance issues that occurred before Plaintiff's leave.  Accordingly, the fact that Plaintiff returned to work and was then terminated will not prevent her from asserting an interference claim for failure to reinstate.

To state a claim for interference under the FMLA, "an employee must show that [s]he was entitled to benefits under the FMLA and that [her] employer illegitimately prevented [her] from obtaining those benefits."  *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007) (*citing Callison*, 430 F.3d at 119); *see also* 29 U.S.C. §§ 2612(a), 2614(a).  More particularly,

> [t]he plaintiff must show that "(1) [s]he was an eligible employee under the FMLA, (2) defendant is an employer subject to the requirements of the FMLA, (3) [s]he was entitled to leave under the FMLA, (4) [s]he gave notice to the defendant of [her] intention to take FMLA leave, and (5) the defendant denied [her] benefits to which [s]he was entitled under the FMLA."

*Kerns v. Drexel Univ.*, No. 06-5575, 2008 U.S. Dist. LEXIS 57358, at *34 (E.D. Pa. Jul. 25, 2008) (*quoting Weisman v. Buckingham Twp.*, No. 04-4719, 2005 U.S. Dist. LEXIS 11696, at *11 (E.D. Pa. Jun. 14, 2005)).  "If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred."  *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (*quoting King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)).  However, the right to reinstatement is not absolute:  "[T]he FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA."  *Sarnowski*, 510 F.3d at 403 (*citing* 29 U.S.C. §

13

2614(a)(3)(B)); *see also Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 488 (6th Cir.

2005) ("'An employee lawfully may be dismissed, preventing him from exercising his statutory

rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless

of the employee's request for or taking of FMLA leave.'"  (*quoting Arban*, 345 F.3d at 401));

*Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 141 (3d Cir. 2004) ("[I]f an employee

is discharged during or at the end of a protected leave for a reason unrelated to the leave, there is

no right to reinstatement."  (*citing* 29 C.F.R. § 825.216(a)(1))); *Strickland v. Water Works &*

*Sewer Bd.*, 239 F.3d 1199, 1208 (11th Cir. 2001) ("[I]f an employer can show that it refused to

reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not

liable.").  Therefore, an employee cannot prevail on her interference claim if the employer "can

establish that it terminated [the employee] for a reason unrelated to [her] . . . exercise [of her]

rights under the FMLA."  *Sarnowski*, 510 F.3d at 403; *see also* 29 C.F.R. § 825.216(a) ("An

employer must be able to show that an employee would not otherwise have been employed at the

time reinstatement is requested in order to deny restoration to employment."); *Campbell*, 478

F.3d at 1288 ("Once a plaintiff has proved that her employer has interfered with her right to take

FMLA leave, the employer bears the burden of proving that an employee, laid off during FMLA

leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA

leave" (internal quotation marks and citations omitted)); *Jones v. Nationwide Credit, Inc.*, No.

07-63, 2008 U.S. Dist. LEXIS 33005, at *5 (N.D. Ga. Apr. 21, 2008) ("An employer can avoid

liability on an interference if it can demonstrate that it would have discharged the employee

regardless of whether or not the employee took leave.  This is an affirmative defense." (internal

citations omitted)); *Parker v. Hahnemann Univ. Hosp.*, 234 F. Supp.2d 478, 487 (D.N.J. 2002)

(finding that plaintiff bears "the burden of proving that she was entitled to reinstatement and was denied it" but that defendants could "mitigate their liability by bearing the burden of proving plaintiff's position would have been eliminated even if she had not taken FMLA leave").

Here, it is not disputed that as far as the November 27-29, 2007, leave is concerned, Plaintiff was an eligible employee and Defendant was an eligible employer under the FMLA. (Doc. No. 1 ¶¶ 8-10 (Compl.); Doc. No. 3 ¶¶ 8-10 (Answer).)  Moreover, for the purposes of summary judgment, Defendant concedes that Plaintiff took an FMLA-covered leave and that she suffered an adverse employment action.  (*See* Doc. No. 9 at 13-14.)  Plaintiff has presented evidence that she was fired within minutes of returning to work following her FMLA leave. (Whitman Dep. at 172.)

Defendant has not addressed the interference claim except to state that Defendant does not believe that Plaintiff has asserted an interference claim.  Thus, Defendant has not attempted to establish that there is no genuine issue of material fact regarding Plaintiff's interference claim. We conclude based upon the record before us that there are genuine issues of material fact on the question of whether Defendant would have terminated Plaintiff's employment regardless of her taking FMLA-qualified leave.[4]

In addition to the "failure to reinstate" interference claim, Plaintiff's Complaint alleges that "Defendant violated FMLA by failing to put [Plaintiff] on notice of her FMLA rights despite [D]efendant's awareness that she was entitled to same."  (Doc. No. 1 ¶ 41.)  Defendant states

---

[4] Even though Defendant did not address the interference claim, it is clear that Defendant will be pursuing the affirmative defense that Plaintiff would have been fired regardless of her FMLA leave.  Indeed, the legitimate, nondiscriminatory reasons for termination that Defendant articulates under the *McDonnell Douglas* framework regarding the retaliation claim, *see infra*, can be viewed as an affirmative defense under FMLA interference analysis.

that "the evidence does not show that [Plaintiff] was unaware of her rights or that this really mattered.  [Plaintiff] was, or should have been, aware of her rights, and even if she were not, she was not damaged by not knowing that she was entitled to FMLA leave because no leave was ever denied her."  (Doc. No. 9 at 23.)

"The United States Court of Appeals for the Third Circuit has determined that a failure to advise claim can be cognizable as an 'interference' claim under § 2615(a), but only if the plaintiff is able to show prejudice resulting from his or her employer's failure to comply with the applicable notice requirements."  *Lynch v. Robertson*, No. 05-201, 2007 U.S. Dist. LEXIS 60835, at *71 (W.D. Pa. Aug. 20, 2007) (*citing Conoshenti*, 364 F.3d at 142-46); *see also Conoshenti*, 364 F.3d at 143 ("[Plaintiff] will show an interference with his right to leave under the FMLA within the meaning of 29 U.S.C. § 2615(a)(1), if he is able to establish that this failure to advise rendered him unable to exercise that right in a meaningful way, thereby causing injury.").

There is evidence that although Plaintiff was aware of the FMLA, she did not understand that she could take intermittent leave as needed.  (Whitman Dep. at 46.)  However, Defendant argues that "[t]o the extent that [Plaintiff] contends that [Defendant] failed to apprise her of rights to take FMLA leave intermittently, the evidence establishes that whether it was known to her or not, she used leave intermittently and that her right to take it was not challenged."  (Doc. No. 9 at 24.)  Plaintiff does not address this issue in her response to Defendant's Motion for Summary Judgment.  (*See* Doc. No. 11.)  Plaintiff has not claimed that the alleged failure by Defendant to advise her of her FMLA rights resulted in prejudice to her, nor has she offered any facts to support such a claim.  Accordingly, we will grant summary judgment for Defendant on

16

Plaintiff's failure to advise interference claim.

###### B.      FMLA Retaliation Claim

In addition to the interference claim, Plaintiff alleges that Defendant terminated her

employment in retaliation for Plaintiff taking FMLA-qualified leave.  (Doc. No. 1 ¶ 42.)  For the

purpose of Defendant's Summary Judgment Motion, Defendant does not dispute that Plaintiff

"took a leave to care for her daughter which qualified under the FMLA and that she has suffered

an adverse action . . . ."  (Doc. No. 9 at 13-14.)  However, Defendant argues that there is no

causal connection between Plaintiff's termination and her FMLA-qualified leave.  (*Id.* at 14.)

Defendant argues that the timing of the termination is the only evidence of retaliation that

Plaintiff offers, but that "the timing in this case is coincidental as the termination decision related

to events that preceded the absence and the decision was discussed before the absence and

finalized without any knowledge of the absence."  (*Id.*)  Further, Defendant states that "[t]here

are no material disputed facts that the late November absence or any earlier absences were

considered by Otte or Batten."  (*Id.* at 15)

When analyzing FMLA retaliation claims, courts must apply one of two burden-shifting

schemes.  *See Hayduk v. City of Johnstown*, 580 F. Supp. 2d 429, 2008 U.S. Dist. LEXIS 50463,

at *57 (W.D. Pa. 2008).  If a plaintiff has direct evidence of retaliation, the courts use the

analysis articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).[5]  *See Hayduk*, 2008

U.S. Dist. LEXIS 50463, at *57.  By contrast, if the evidence of retaliation is circumstantial, then

---

[5] "Although Congress overruled the *Price Waterhouse* test in the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e-2, 2000e-5(f), that Act applies only to Title VII cases and, thus, courts continue to use the *Price Waterhouse* analysis in other non-Title VII discrimination cases." *Lackman v. Recovery Servs. of New Jersey, Inc.*, No. 06-2016, 2008 U.S. Dist. LEXIS 11085, at *16-17 n.4 (D.N.J. Feb. 13, 2008).

courts review the case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See*

*Hayduk*, 2008 U.S. Dist. LEXIS 50463, at *57.

       *1.*    *Direct Evidence and* Price Waterhouse

    Under *Price Waterhouse*,

> when an FMLA plaintiff "alleging unlawful termination presents 'direct evidence' that his [FMLA leave] was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had no considered [the FMLA leave]."

*Conoshenti*, 364 F.3d at 147 (*quoting Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002)).

"'Direct evidence' means evidence sufficient to allow the jury to find that 'the decision makers

placed substantial negative reliance on [the protected activity] in reaching their decision' to fire

him."  *Conoshenti*, 364 F.3d at 148 n.10 (*quoting Fakete*, 308 F.3d at 338-39).

    The District of New Jersey decision in *Tamayo v. Deloitte & Touche, LLP*, No. 05-3364,

2007 U.S. Dist. LEXIS 2878 (D.N.J. Jan. 16, 2007), is instructive on this issue.  In *Tamayo*, the

plaintiff urged the court to apply *Price Waterhouse* to her claim that the defendant based its

decision to terminate her employment in substantial part on FMLA-protected absences.  *Id*. at

*17, 19-20.  In support of her argument that there was "direct evidence" of retaliatory animus,

the plaintiff pointed to a memo by her supervisor that made "frequent reference to [the

plaintiff's] attendance and absences over the preceding months and describ[ed] 'issues around

attendance' as a 'significant concern.'" *Id*. at *20.  The memo also noted that the supervisor told

the plaintiff that "'due to her absences she was not doing the essential parts of her job, and this

was unacceptable, and had to change.'" *Id*. at *20-21.  The plaintiff argued that because the

defendant clearly based its decision to terminate her on absences, and "'since Defendant did not

separate her FMLA absences from any other non-protected absences, it cannot contend that it did

18

not consider her FMLA-protected absences when it decided to terminate her.'" *Id*. at *21. The court found that the plaintiff "had not presented sufficient *direct evidence* of a retaliatory animus to bring her claim within the ambit of *Price Waterhouse*." *Id*. (emphasis in original). The court explained that

> [g]eneral statements made by [the supervisors] regarding [the plaintiff's] attendance and performance problems, in light of the fact that she had a prior history of attendance issues and allegedly missed a number of days unrelated to her mother's illness, do not unambiguously reflect a retaliatory animus to terminate [the plaintiff] for taking leave to care for her mother.

*Id*. at *22. The court declined to apply *Price Waterhouse*, and applied *McDonnell Douglas* instead. *Id*.

In this case, as in *Tamayo*, there is evidence of Defendant's concerns related to Plaintiff's attendance. Defendant was also troubled by performance issues that may have been related to her absences. However, not all of Plaintiff's absences were FMLA-qualified. Moreover, Defendant's stated reason for terminating Plaintiff's employment – customer complaints – is well-documented and many complaints did not correspond in time to any absence, FMLA-qualified or not. Plaintiff has not provided sufficient direct evidence that her taking of FMLA leave was a substantial factor in the decision to terminate her employment. Accordingly, we will apply *McDonnell Douglas*, rather than *Price Waterhouse*.

### 2. *Indirect Evidence and* McDonnell Douglas

Under the *McDonnell Douglas* framework,

> plaintiff must first establish a prima facie case of discrimination by showing (1) that she took advantage of the protected right to leave under the FMLA, (2) that she was adversely affected by an employment action taken by defendants, and (3) [that] the unfavorable employment action was caused by her choice to take leave under the FMLA. Then, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Then, plaintiff must

show that the nondiscriminatory reason given is really a pretext for actual discrimination.

*Parker*, 234 F. Supp. 2d at 492 n.14.

> a.   Plaintiff's Prima Facie Case

Plaintiff has established a prima facie case of retaliation for taking FMLA leave. Defendant does not contest the first two elements of the prima facie case, namely, that Plaintiff took FMLA leave and that she was adversely affected by an employment action.  Defendant argues, however, that "[a]t most, the sole evidence [Plaintiff] provides on the third prong is the timing of the termination, occurring when she returned from an FMLA qualifying absence." (Doc. No. 9 at 14.)

"The Third Circuit has stated that 'the mere fact that adverse employment action occurs after [a protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'"  *Reinhart v. Mineral Techs. Inc.*, No. 05-4203, 2006 U.S. Dist. LEXIS 89279, at *33-34 (E.D. Pa. Nov. 27, 2006) (*quoting Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997)).  "However, the court has gone on to clarify that if the timing of the alleged retaliatory action is 'unusually suggestive of retaliatory motive' a causal link will be inferred."  *Reinhart*, 2006 U.S. Dist. LEXIS 89279, at *34 (*quoting Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)).  "The Third Circuit has inferred a causal link where only two days passed between the plaintiff's protected activity and the adverse employment action . . . ."  *Reinhart*, 2006 U.S. Dist. LEXIS 89279, at *34 (*citing Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)); *see also Reinhart*, 2006 U.S. Dist. LEXIS 89279, at *35 (finding that the temporal proximity was unduly suggestive where "over a period of approximately twenty-four hours, [the plaintiff's] initial FMLA leave ended, the termination

decision was made, and he requested additional leave"); *Parker*, 234 F. Supp.2d at 492 n.15 (finding that "discharge on the day of plaintiff's return is enough to suggest causation at this prima facie stage of the summary judgment motion").

In this case, the decision to terminate Plaintiff's employment was finalized the day after Plaintiff went out on FMLA leave.  Plaintiff was informed of her firing within minutes of her return to work following the FMLA leave.  We are satisfied that this close temporal proximity is unduly suggestive of a causal link between Plaintiff's FMLA leave and her termination.

b.      Defendant's Legitimate, Nondiscriminatory Justification

Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.  Defendant asserts that the decision to fire Plaintiff was based entirely upon "the large number of customer complaints in a short period of time culminating in the early November complaint from Ernie James."  (Doc. No. 9 at 21.)  Defendant contends that Plaintiff's job performance was the reason for her termination.

c.      Plaintiff's Evidence of Pretext

Since Defendant has provided a legitimate, nondiscriminatory explanation for the termination decision, Plaintiff must show that Defendant's reason was a pretext for actual discrimination.  A plaintiff can show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons."  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (citations and internal quotations omitted).

The record demonstrates that there is a question about whether Plaintiff's attendance, including her FMLA-qualified absences, played a part in Defendant's decision to fire her.  The evidence shows that Defendant was concerned about Plaintiff's spotty attendance and that it recognized that many of her absences resulted from her need to take care of her children.[6]  (*See, e.g.*, Doc. No. 9, Ex. W-7 ("I realize that some of the absences are a bit out of your control, but the strain is it placing on the GTT is causing stress for all involved."); *id*, Ex. W-26 ("[T]he biggest problem is the fact that [Plaintiff] is only working about 30 hours a week (if that) for a job that requires 40.  Although I feel for her personal situation, we have to take a firm stance here and advise her that 40 hours a week is required and expected.").)  In addition, the three managers who decided to terminate Plaintiff's employment do not agree on the extent to which Plaintiff's absences were considered as a reason to fire her.  Otte testified that Plaintiff's frequent absences on short notice caused work problems.  (Otte Dep. at 16.)  Petrucelli also testified that Plaintiff's attendance was an issue and was discussed at the meeting.  (Petrucelli Dep. at 44-45.)  However, Batten testified not only that Plaintiff's attendance did not play a role in the decision to terminate her, but also that he did not even know that she had a poor attendance record.  (Batten Dep. at 25.)

There is also a question about whether the decision-makers knew that Plaintiff was on FMLA-leave at the time of their meeting on November 29, 2007.  Otte and Batten claimed that they did not know whether Plaintiff was absent that day.  (Otte Dep. at 27-28; Batten Dep. at 10.)  Although Petrucelli also claimed that she did not know whether Plaintiff was absent from work

---

[6] We note, however, that not all absences to care for one's children, even sick children, are FMLA-protected.

22

(Petrucelli Dep. at 18, 36, 53, 56), at another point during her deposition Petrucelli testified that when the termination decision was made, she knew that Plaintiff was absent:  "I wasn't clear about anything that was going on with her when she was out.  There was no clear-cut reason why she was out, except she was out sick."  (*Id*. at 52.)

In addition, Plaintiff has raised questions about Defendant's position with regard to who made the decision to terminate Plaintiff and when the decision was made.  Otte insists that he made the decision to terminate Plaintiff in early November 2007.  (Otte Dep. at 10.)  However, Defendant's Answers to Plaintiff's Interrogatories gave November 29-30, 2007 as the dates on which Defendant decided to terminate Plaintiff.  (Doc. No. 11, Ex. C, Nos. 10, 18.)  Defendant explained that on November 29, 2007, "Bob Battten [sic] met with Phil Russo and stated that Plaintiff's employment with [Defendant] needed to be terminated."  (*Id*., No. 18.)  "On November 30, 2007, Russo met with Petrucelli and discussed terminating Plaintiff's employment . . . ."  (*Id*.)  As Plaintiff points out, Defendant "failed to mention Mr. Otte's central, pivotal and ultimate role . . . .  Indeed, **IT FAILED TO MENTION THE MEETING IN MR. OTTE'S AT ALL!!!!!!!!!!!!!!!!!!!!!!!!!!!!**"  (Doc. No. 11 at 12 n.7 (emphasis and twenty-eight exclamation points in original).)[7]  Plaintiff suggests that Defendant's "evasiveness" on this issue be considered as an indication of pretext.  (*Id*.)

Further, Plaintiff points to the fact that although Defendant relies heavily on customer complaints, especially the Ernie James complaint, as justification for its termination decision,

---

[7] We note that throughout his response to the Motion for Summary Judgment, Plaintiff's Counsel has attempted to emphasize certain facts or arguments by using various combinations of bold type, italics, capitalization, and multiple exclamation points.  We would suggest that Counsel cease this practice.  Not only does it not have the desired effect, it is less than professional.

"*plaintiff's termination did not coincide nearly as temporally with the customer complaints, dress code violations and co-employee complaints touted so vociferously by defendant as it did to the exercise of her FMLA rights in late November 2007.*"  (Doc. No. 11 at 35 (emphasis in original)).  Indeed, there is testimony that the Ernie James complaint was the straw that broke the camel's back.  (Russo Dep. at 23, 37.)  Yet, despite the fact that James complaint arrived on November 6, 2007, and although Otte claims to have made his decision to fire Plaintiff in early November, Otte did not speak with the other managers or finalize the termination decision until Plaintiff went out on FMLA-covered leave.  *See Moorer*, 398 F.3d at 490 (finding the fact that the defendant "was aware of many of [the plaintiff's] alleged performance deficiencies prior to his FMLA leave . . . . but did not decide to effectuate the termination until [the plaintiff] took leave, could lead a fact finder to infer that [the plaintiff] would not have been fired absent his actual taking of that FMLA leave"); *Kohls v. Beverly Enters. Wis. Inc.*, 259 F.3d 799, 806 (7th Cir. 2001) ("We can imagine circumstances in which the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware).").

Finally, Plaintiff argues that the complaints and criticisms regarding her work performance all stem from an earlier FMLA absence in April 2007.  Plaintiff points to Petrucelli's testimony that "ongoing performance issues" began around "February, March or April" of 2007.  (Petrucelli Dep. at 83.)  Otte also testified that Plaintiff's "performance issues" began in April 2007.  (Otte Dep. at 10.)  Plaintiff asserts that the only evidence of "performance

issues" relates to an allegedly FMLA-qualified leave that she took in April.  (Doc. No. 11 at 8.) After Petrucelli began monitoring Plaintiff, "[a] veritable barrage of criticisms and complaints concerning plaintiff, all of which were unprecedented, followed."  (*Id*. at 9.)

We are satisfied that Plaintiff has adduced sufficient evidence of inconsistencies and contradictions to undermine the credibility Defendant's legitimate, nondiscriminatory termination reasons, at least for the purposes of satisfying her burden at the summary judgment stage.  Accordingly, Defendant's summary judgment motion on Plaintiff's FMLA retaliation claim will be denied.

## IV.   CONCLUSION

We will grant Defendant's Motion for Summary Judgment as to Plaintiff's FMLA "failure to advise" interference claim.  We will deny Defendant's Motion on the failure to reinstate interference claim and the retaliation claim.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUZETTE WHITMAN | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 08-2667 |
| PROCONEX, INC. | : | |

## **ORDER**

AND NOW, this 20th day of January, 2009, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 9), and all documents submitted in support thereof and in opposition thereto, and after reviewing the evidence presented to the Court, it is ORDERED as follows:

1.  Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's FMLA "failure to advise" interference claim; and

2.  Defendant's Motion for Summary Judgment is DENIED as to Plaintiff's FMLA "failure to reinstate" interference claim and FMLA retaliation claim.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, Judge